WENBERG (ATLANTIC DOCK CO. v.). See Case No. 622.

WENDELL (THAYER v.). See Case No. 13,873.

WENDELL (UNITED STATES v.). See Case No. 16,666.

WENDLINGER, Ex parte. See Case No. 2,235.

---

## Case No. 17,410.

### The WENONA.

[4 Ben. 207.] [1]

District Court, N. D. New York. May, 1870.[2]

COLLISION ON LAKE ERIE—STEAMER AND SCHOONER—VESSELS MEETING—LIGHTS—CHANGE OF COURSE IN EXTREMIS.

1. The steamer W. and the schooner F. came in collision on Lake Erie, on the night of November 29, 1869. The wind was about south. The F. was heading about southwest by west, close hauled, running five or six miles an hour. She saw the head-light of the W. nearly ahead, but a little on her starboard bow, and at once displayed a torch light. That light was displayed a second time before the collision. The F. was kept on her course till shortly before the collision, when her helm was put hard a-port. The W. was heading east three-quarters north. She saw the flash light of the F. a little on her port bow, and kept on till the green light of the F. was seen nearly ahead, when her helm was put to starboard, and she swung slowly to port, keeping on at her speed of eight to ten miles an hour, till the vessels were, as she claimed, from an eighth to a quarter of a mile apart, and the green light was on her starboard bow, when the green light disappeared. and the red light of the F. came in sight. The helm of the W. was at once put hard a-starboard, and her engine was stopped and backed, and several turns back were made before the collision. The W. struck the F. on her port bow, angling forward. and sunk her. It appeared that the lights of the F. were set on her pawl post, and were twenty-two inches apart, that being the diameter of her bowsprit. Held, that the steamer was in fault for not having taken earlier and more decided measures to avoid the schooner; that she should have starboarded more decidedly when she made the first change; that she should have slowed before she did. stopped and backed earlier; and that, on seeing the red light. she should have ported.

2. The schooner was not in fault for changing her course on seeing the near approach of the steamer, without any apparent change of her course. notwithstanding the exhibition of the two torch lights.

3. The lights of the F. were not placed in accordance with the statute, and their position was a fault on her part, but the W. was not

---

[1] [Reported by Robert D. Benedict. Esq.. and here reprinted by permission.]

[2] [Reversed in Case No. 17,411. Decree of circuit court reversed by supreme court in 19 Wall. (86 U. S.) 41.]

misled by them, and that fault therefore did not contribute to the collision.

In admiralty.

B. H. Williams and Ganson, for libellant.
Geo. B. Hibbard, for respondents.

HALL, District Judge. This suit is prosecuted by William T. Fraser, the owner of the schooner Fremont, against the propeller Wenona, to recover the damages occasioned by a collision between those vessels on Lake Erie, about nine o'clock in the evening of the 29th day of November, 1869. The Fremont sunk soon after the collision, and, with her cargo of salt, was totally lost.

The libel alleges that, about nine o'clock in the evening, while the Fremont was on a voyage from Oswego to Sandusky, and near the middle of Lake Erie the masthead light of the Wenona was discovered nearly ahead, and apparently about a mile and a half distant; that the schooner was then moving southwest by west half west, about five or six miles an hour; that she was properly officered and manned, and had the proper lookout, and displayed the required signal lights; that as soon as the masthead light of the Wenona was discovered, a torch light was lighted, and conspicuously displayed on the Fremont, and that such torch was kept lighted and swung on the Fremont until on or about the moment of the collision; that after said masthead light was discovered, the Fremont kept her said course, and very soon after, the red and green lights of the propeller were discovered ahead of the schooner, and apparently about a mile off; that the schooner kept her course, and a few minutes afterwards the hull of the propeller was discovered on the port bow of the schooner, and the propeller seemed to be crossing the bow of the schooner; that the propeller continuing to approach the schooner with great velocity, and a collision being inevitable, and the propeller being about to run down the schooner, the master of the schooner, to lessen the force of the blow, ordered the helm of the schooner to be put to port; that the propeller immediately thereafter struck with her stem the port side of the schooner, on her weather bow, at an angle from eight to ten points, staving in the bow, and smashing the planks and timber of the schooner, so that the schooner and her cargo sank and were totally lost, about an hour after the collision took place. The libel also alleges that the weather was hazy, with rain, and that the wind was from the south.

The answer alleges that the propeller was properly officered, manned, and navigated, and had the proper lookout and signal lights, and was not in fault in respect to the collision; and it denies all the allegations of the libel, which are inconsistent with the statements of the answer. It then states that while the propeller was proceeding on a course east three-quarters north, a flash light was seen at a considerable distance off, about half a point on the propeller's port bow; that the flash light appeared alone for a short time, when a green light was seen from the propeller, dead ahead, or nearly so; that the wheel of the propeller was put a-starboard, and she swung and continued to swing to port; that the green light opened on the propeller's starboard bow, and afterwards the green light of the schooner disappeared, and her red light became visible; that the wheel of the propeller was put hard a-starboard, and her engine was stopped and backed; that soon afterwards the propeller and schooner came in collision, the schooner striking the propeller on her starboard bow, at an angle which the respondents were unable to state precisely.

These statements of the pleadings are meagre and indefinite, rather than full and precise; and there is, in some respects, considerable discrepancy between the allegations of the parties and their proofs. The proof, on the part of the Wenona, is, that although her general course was, by her own compass, east three-quarters north, as stated in the answer, her true and actual course was east by north half north, or three-fourths of a point to the northward of the course stated in the answer. The proofs on the part of the schooner are, that her heading was southwest by west half west, as stated in the libel, but her master testified that she was making about a point leeway. There was therefore, according to the proofs of the two vessels, only a single point between the lines of their respective keels, and still less difference in the lines of their actual progress, as they were proceeding in nearly opposite directions. There is little doubt that the speed of the propeller was about ten miles an hour, and the speed of the schooner about five or six miles an hour. The proof shows that the night was dark, with a drizzling rain; and although the witnesses state that there was no fog, they all agree that there was a haze upon the water. It was therefore a night not favorable to the early discovery of approaching signal lights, and for that reason great care and vigilant watchfulness on the part of the lookout and officer in charge of each vessel, were required in order to prevent a collision.

(After giving an abstract of the statements of the principal witnesses from each vessel, the judge proceeded): Upon these pleadings and proofs, it is not difficult to reach a satisfactory conclusion in respect to some of the material facts of the case; but in respect to others, and particularly in respect to the distances between the vessels when the different changes of helm were made, and to the extent to which each vessel changed her course, there is much uncertainty and doubt. The general course, or rather heading, of the Wenona, before her course was changed to avoid a collision, was east by north half north, and that of the Fremont was southwest by west half west. They were therefore heading in nearly opposite directions, there being only a single point between the lines of their respec-

tive keels, and the leeway which the Fremont was making made the lines of their actual progress nearly parallel. The Fremont, when her torch light was first seen from the Wenona, was about half a point off the port bow of the latter. The Wenona was more nearly directly ahead of the Fremont, but probably about a quarter of a point off her starboard bow. But such bearings are only approximations to mathematical accuracy, for when a light is seen half a point or more off the bow of a moving vessel, and its bearing is deliberately and carefully estimated by the eye only, without the use of a compass or other instrument to determine its bearing, such estimate may be deemed a close one if it is within a quarter of a point of the true bearing. Estimates of time and estimates of distance—particularly the distance between vessels approaching each other in a dark, hazy, rainy night—are still more unreliable; but, nevertheless, it is upon such and similar estimates, and upon the conflicting testimony of witnesses not always disinterested and unprejudiced, that courts of admiralty are compelled to decide important collision suits, according to their views of the preponderance of the testimony and the probabilities of the case.

The estimates of the respondent's witnesses in respect to the distance between the vessels and the time that elapsed between the first exhibition of a torch light and the collision, if entirely reliable, would show that the vessels were then two miles or more apart; but their testimony in respect to the subsequent management of their own vessel and the angle at which the vessels struck, as well as the testimony on the part of the libellant, renders it most probable that when the torch light was first seen, the vessels were not more than a mile and a half apart. The wind was between south and south-south-east, and probably between south and south by east. The Fremont was nearly close-hauled, and was making considerable leeway; and her master, who alone testified in respect to the extent of such leeway, estimated that her actual course through the water was a point to the northward of the line of her keel. This estimate may be somewhat too liberal, and the propeller may have made a very little leeway; and it may therefore be safe to assume that the leeway of the schooner exceeded that of the propeller only half or three-fourths of a point. The heading of the Fremont being one point more to the southward than the northward heading of the Wenona, the former should show, as she did, her green light to the Wenona, while it is quite probable that the Wenona, from her being more directly ahead of the Fremont, and from the shorter screens of her signal lights would show both her colored lights to the Fremont. Almost immediately after first seeing the green light of the Fremont, and before any sufficiently careful observation of the continued bearing, or change of bearing, of her light had been

made, the wheel of the Wenona was starboarded, and she continued to swing very slowly under a starboard wheel, until her wheel was ordered hard-a-starboard, a very short time prior to the collision. She was not steadied after her wheel was first starboarded, and her master testified that he thought she might have swung seven and a half points to port before the collision.

The slow but continuous change of the propeller's course, as she proceeded at a speed of about ten miles an hour, and as the schooner proceeded on her course at a speed of five or six miles an hour, and making a half a point or more of leeway, would probably keep the propeller's head so nearly directly towards the schooner, that both the propeller's signal lights would be seen from the schooner, although the schooner, from her heading being about half a point to the southward of the propeller's original heading and position, and still further to the southward of the propeller's heading after her wheel was put to the starboard, would continue to show her green light to the propeller until the schooner's wheel was put hard-a-port, to avoid the collision, or to lessen the effects of the blow. And this would be the more probable, because, as soon as the propeller's course was changed half a point under her starboard wheel, she would be running on a curved line which would carry her more and more to the northward of the heading of the schooner. When the schooner put her wheel hard-a-port and changed her course so as to bring her red light into view from the propeller, the propeller's wheel was put hard-a-starboard, and both vessels swung rapidly to the northward until they struck.

As before stated, it can hardly be doubted that most of the estimates of time and distance made by the witnesses of the respondents were too liberal, and that the changes of the helm of the propeller were not ordered until the vessels were nearer together than their estimates would indicate. If the vessels were two miles apart when the first torch light was seen by the lookout and master of the propeller, and her wheel was then starboarded, and afterwards put hard-a-starboard—both as soon after as should be inferred from their testimony—it is hardly possible that the propeller ran less than three-fourths of a mile while constantly swinging under a starboard wheel, or that she would not have swung to port more than seven and a half or even nine points before the collision. On the other hand, it is quite certain that some of the estimates of time and distance made by the libellant's witnesses are not sufficiently liberal, and it is most likely that the wheel of the schooner was ordered hard-a-port when the two vessels were as much as three or four and possibly five or six hundred feet apart.

The proof on the part of the schooner is positive that she kept steadily upon her general course, until her helm was put hard-a-

port just prior ·to the collision; and the proof on the part of the propeller does not tend to prove any change of her course until the change was made which brought her red light into view, a short time before the collision. The propeller's witnesses state that the vessels were then from an eighth to half a mile apart, but this distance, like the other distances, was doubtless overstated. On the other hand, the witnesses for the libellant who state that the vessels were not more than from 100 to 400 feet apart, when the schooner's helm was ordered hard-a-port— different witnesses giving different estimates of the distance—have probably under-estimated the distance. It was after this red light was seen from the Wenona that her wheel was ordered hard-a-starboard; and it was not until after that second change of wheel, nor until after the master of the Wenona (as he testified) saw that they could not clear the schooner, that the bells of the Wenona were rung to stop and back her engine. The engineer of the propeller testified that he stopped and reversed his engine in four seconds, and that the engine had made from six to eight and perhaps ten revolutions backward before the vessels struck. Her master's testimony in respect to giving and immediately repeating the signals to stop and back, and the striking of the vessels immediately after, as well as the great force and destructive effects of the blow, and the testimony of the libellant's witnesses that they heard the bells of the propeller just before the vessels struck, show that these signals were not given until the vessels were very near together, and no previous order to slacken the propeller's speed had been given. The master of the Wenona says that when he first saw the red light of the schooner, she was from a quarter to half a mile off, and then he ordered his wheel hard-a-starboard. If she was then even a quarter of a mile off, and he had instantly rung to stop and reverse his engine, it is believed that the headway of the Wenona could have been stopped, or so much lessened that the schooner would not have been struck, or would not have been very materially injured, even if the vessels had come in contact. But no signal to stop and reverse, or even to slacken speed, was then given, and it is evident that the signal to stop and back was given so late that the speed of the propeller had not been greatly reduced before the collision occurred.

The testimony on the part of the libellant shows that the propeller, as she approached the schooner, continued to head nearly on the latter, and that the schooner's helm was not changed until a collision seemed inevitable. A powerful propeller, approaching at full speed, and continually heading almost directly upon the schooner, without any apparent change of course tending to avert the threatened collision, until the vessels were not more than five or six hundred feet apart, although two successive torch-lights had

been burned to warn her of the apprehended danger, would present such an appearance of great and imminent danger to the vessel and her crew, that the most experienced and least excitable officer of the deck might well feel that something must be done to avert the impending danger. As against the party whose fault had brought him into such danger, even an error of judgment should not, under such circumstances, be considered a fault. But it is by no means certain that there was any error of judgment. The propeller had the right to choose her side in passing the schooner, and she had not made a decided change of course, so as to show that her wheel had been changed. In ignorance of what change, if any, she would make, and with the imminent danger of being almost immediately run down by a propeller which had apparently given no attention to her two torch-lights, or her ordinary signal lights, the master of the schooner can hardly be deemed in fault, because he ordered his wheel hard-a-port; even if there was no reason whatever for preferring that order, to an order to put the wheel hard-a-starboard. But the more usual change of wheel to avoid a collision, when the approaching vessel is in imminently dangerous proximity, is to put it hard-a-port; and it is the habit, and it may almost be said to be the instinct, of a sailor to adopt that course, when there is apparently no reason to prefer the opposite change of helm. But, in this case, the proof shows that the Wenona, though coming almost directly towards the schooner, was on the schooner's port bow; so that the change of wheel made by the schooner was the proper change, under all the indications to which her master was obliged to look to determine its propriety. Besides, the vessels were then so situated, both in respect to their heading, and their dangerous proximity and speed, that it is impossible to say that the collision would have been averted, or the injury less, if the schooner had not changed her wheel, as it is most likely that the schooner would then have been struck on her side, nearly amidship and more nearly at a right angle.

The provisions of the 3d section of the act of congress of April 29, 1864 [13 Stat. 59], so far as the same relate to signal lights to be carried by sail vessels, and which require sailing ships or vessels, when under way, to carry. "On the starboard side, a green light so constructed as to show an uniform and unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side, and of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles;" and. "On the port side, a red light, so constructed as to throw an uniform unbroken light over an arc of the horizon of ten points of the com-

pass, so fixed as to throw the light from right ahead to two points abaft the beam on the port side, and of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles;" and that "the said green and red lights shall be fitted with inboard screens, projecting at least three feet forward from the light, so as to prevent these lights from being seen across the bows," must be considered, as they prescribe the signal lights which the Fremont was bound to carry and display on the night of the collision. In addition to colored lights, such as the Fremont was bound to carry, the Wenona was bound to carry, and did carry, a bright mast-head light; but it is not necessary to refer more particularly to the provisions relating to the lights to be carried by propellers and other steam vessels, because it is not deemed necessary to discuss the question as to the sufficiency of the propeller's lights. It is entirely clear that the collision complained of was not caused by any deficiency in the propeller's signal lights; and there is scarcely any doubt that she carried and displayed all the signal lights required.

The 15th, 16th, 18th, and 19th articles of said act prescribe the duties which devolved upon the Wenona and Fremont, from the time that there was risk of a collision between them. These articles are the same, in substance, as the rules which had been often sanctioned and enforced by our courts of admiralty, in cases like those provided for in such articles, before the adoption of such articles by the act of congress. In the case of New York & Liverpool U. S. M. S. Co. v. Rumball, 21 How. [62 U. S.] 372, 383, the supreme court of the United States, after discussing the testimony in the case, and showing that the direct testimony of those on board a sailing vessel, in respect to an alleged change of her course, should generally prevail as against the statements or opinions of the witnesses on the approaching vessel, proceed to say, "The evidence clearly shows that the brig kept her course. without any change whatever, until the peril was impending and the collision inevitable. An error committed by those in charge of a vessel under such circumstances, if the vessel is otherwise without fault, would not impair her right to recover for the injuries occasioned by the collision, for the plain reason that those who produced the peril, and put the vessel in that situation, would be chargeable with the error, and must answer the consequences. Sailing vessels, when approaching a steamer, are required to keep their course; and steamers, under such circumstances, as a general rule, are required to keep out of the way. Many considerations concur to show that all those, engaged in navigating vessels upon the seas, are bound to observe the nautical rules, recognized and approved by the courts, in the management of their

vessels on approaching a point where there is danger of collision. Those rules were framed and are administered to prevent such disasters, and to afford security to life and property exposed to such dangers; and public policy, as well as the best interest of all concerned, requires that they should be constantly and rigidly enforced in all cases to which they apply. Few cases can be imagined where it is more needful that they should be observed than when a steamer and a sailing vessel are approaching each other in opposite directions, or on intersecting lines, for the obvious reason that the negligence of the one is liable to baffle the vigilance of the other; and if one of the vessels, under such circumstances, follows the rule, and the other omits to do so, or violates it, a collision is almost certain to follow. Rules of navigation, such as have been mentioned, are obligatory upon vessels approaching each other, from the time the necessity for precaution begins, and continue to be applicable as the vessels advance, so long as the means and opportunity to avoid the danger remain. They do not apply to a vessel required to keep her course, after the approach is so near that the collision is inevitable, and are equally inapplicable to vessels of every description, while they are yet so distant from each other that measures of precaution have not become necessary to avoid a collision. Sailing vessels approaching a steamer are required to keep their course on account of the correlative duty which is devolved upon the steamer in order that the steamer may know the position of the object to be avoided, and may not be led into error in her endeavor to comply with the requirement. Under the rule that the steamer must keep out of the way, she must of necessity determine for herself, and upon her own responsibility, independently of the sailing vessel, whether it is safer to go to the right or left, or to stop; and in order that she may not be deprived of the means of determining the matter wisely, and that she may not be defeated or baffled in the attempt to perform her duty in the emergency, it is required in the admiralty jurisprudence of the United States that the sailing vessel shall keep her course, and allow the steamer to pass either on the right or left, or to adopt such measures of precaution as she may deem best suited to enable her to perform her duty and fulfil the requirement of the law to keep out of the way. Repeated decisions of this court have affirmed the doctrine here laid down, and carried it out to its logical conclusion, and in so many instances that the question cannot any longer be regarded as open to dispute. Accordingly, it was held in the case of the steamer Oregon v. Rocca, 18 How. [59 U. S.] 570, that when a steamer approaches a sailing vessel. the steamer is required to exercise the necessary precautions

to avoid a collision; and if this be not done, prima facie, the steamer is chargeable with fault." And see The Nichols, 7 Wall. [74 U. S.] 656, 666; The Carroll, 8 Wall. [75 U. S.] 302, 305, 306.

Under the rules of navigation cited from the act of congress, and under the well considered decisions of the admiralty courts, the Wenona must be held in fault.

1. She was sufficiently warned by the display of the first torch light on the Fremont that there was risk of a collision, and the result proves that the apprehensions which prompted that signal of danger were not unfounded. There was then, or almost immediately after, a risk of collision involved, as was admitted by the master of the propeller in ordering his wheel to be changed in order to avoid it. It was then, by the express and imperative language of article 16, the duty of the Wenona to slacken her speed; and the failure to obey the rule in this respect is considered a distinct fault.

2. The light of the schooner was on the propeller's port bow when the propeller's wheel was starboarded, and the actual course of the schooner, in consequence of her lee-way, was not then carrying her to the starboard side of the propeller. Only the green light of a vessel should be visible from an approaching vessel if the heading of the former be half a point or more to the starboard side of the latter, and as the wind then was, it was apparent that the vessels were running in nearly opposite directions. If a change of course, without checking the speed of the propeller, was to be relied upon to prevent a collision and the vessels were then so near together that there was not sufficient time to watch the schooner's light until it could be determined in which direction, and to what extent, the propeller's wheel should be changed, it should have been put hard over, so as to produce a rapid and marked change of course, not only sufficient to prevent a collision, if the schooner maintained her course, but sufficient also to relieve those in charge of the approaching vessel from such appearances of impending destruction as might reasonably induce a change of course. The change of the propeller's wheel was made without a sufficient knowledge of the schooner's course; it was in the wrong direction, and so slight that it increased the chances of a collision, and finally produced that complained of. If there was not sufficient time to ascertain the actual position and course of the schooner, so that the proper change of helm could be deliberately determined upon, the change made under such circumstances of doubt should have been so decided, that proper watchfulness on the part of the officer of the deck and lookout of the schooner would have secured them against reasonable apprehension of being run down by the propeller.

3. The second torch light of the schooner, the near approach of the vessels, and other indications of danger even before the red light of the schooner was seen, should have induced an order to stop and reverse the engine of the pro-

peller; but this order was not given even as soon as the red light appeared. If it had been then given, and the vessels were as far apart as the master of the Wenona supposes, the Fremont would have escaped entirely, or without more than a trifling injury; and if, as is believed, the vessels were then so near together that the headway of the propeller could not have been nearly stopped, there is abundant reason for saying that the engine of the propeller was not stopped and reversed as soon as the rules require.

4. The proof shows that the schooner's light when first made was about half a point on the port bow of the propeller, and that although the propeller swung to port several points, under a starboard wheel, before the schooner's green light was shut in, and her red light appeared, she was still, as the master of the Wenona says, only about two points off the starboard bow of the propeller, thus clearly showing, that either from her leeway or other cause, her actual course was continually leading her to the leeward, and across the line of the original or general course of the propeller; and yet the master of the propeller continued to swing his vessel slowly to starboard, until her red light made it certain that she was passing rapidly across his bow to his port side, and then, (when, as he now says, he thinks she was a quarter to half a mile off), he ordered his helm hard-a-starboard, instead of stopping and backing, or ordering his wheel hard-a-port, to pass under her stern. It is true the vessels were probably so near together when the red light appeared, that an order to put the helm of the propeller hard-a-port, might not have prevented the collision; but taking the estimate and testimony of the master of the Wenona to be entirely correct, it is quite certain that the collision could then have been prevented, either by putting his helm hard-a-port or stopping and reversing his engine. Indeed, looking at the case as it would stand upon the testimony of the master of the Wenona alone, it is impossible to resist the conclusion that the Wenona was in fault; especially in not lessening her speed as soon as there was risk of collision, in not making a decided change of course when his helm was starboarded, and in failing to stop and reverse his engine when the circumstances required it. The importance of a strict observance of the rules which require steamers to slacken their speed and to stop and reverse their engines, and also of making decided, instead of very slight changes of helm, were fully discussed by this court in the case of the Arctic and the Scioto, and can hardly be over stated.

The conclusion that the propeller was in fault, renders it necessary to consider whether the schooner should also be held in fault, in respect to the collision. It appears that the signal lights of the Fremont were set on her pawl-post, and their sides were twenty-two inches apart, that being the diameter of her bowsprit; that they were square on two sides, and round on the other, so as to set in a corner, and were eight inches through the square part; that

there was a screen board an inch and a quarter thick, and eight or nine feet long, and a foot and a half wide at the pawl-post, set up between the lamps, and that the pawl-post was about five feet above the deck, and a foot above the rail. That this location of the colored lights of the schooner was improper, was insisted upon by the respondents, and it was urged that the collision was caused by the fault of the schooner, in not fixing and displaying her signal lights as required by statute; and by her change of course a short time before the collision.

On the other hand it was insisted by the libellant, that the schooner's lights were properly fixed and displayed; that there is no provision of the statute which required a different location; that the schooner's course was not changed until a collision was inevitable; and that such change of course did not contribute to the collision.

It can hardly be doubted that the schooner's lights were not located and fixed as the statute requires. Although no precise location is, or indeed properly could be, prescribed by the statute, the rule requires that vessels shall carry on the starboard side, a green light, and on the port side, a red light; and the language, and the reason of the rule alike require that these lights should be displayed substantially on their respective sides of the vessel, instead of being carried inboard and substantially on the centre line of the hull. Their location upon the pawl-post nearly over the keel of the vessel, and several feet abaft the stem, is not a compliance with the statute; and in that location they are much more likely to be obscured from the lookout of an approaching vessel, than when carried on the side or rail, or in the fore-rigging. The indications afforded by these colored lights are, and, to a certain extent, must be mainly relied upon to determine the course of a vessel, approaching another vessel in the night, and no court should relax the stringency of the statutory rule, which requires their location substantially upon the side of the vessel, and the fixing of their side screens of such form and length as the statute prescribes, so nearly parallel to the line of the keel, as to be in substantial if not in strict conformity with the act of congress. If properly located and sufficiently secured in the fore-rigging, with the required side screens carefully adjusted on lines parallel to the vessel's keel, they may be quite as efficient as when carried upon the rail; but to sanction their location upon the pawl-post would, it is believed, be extremely injurious to the interests of commerce. The schooner should therefore be held in fault, unless the testimony in the case satisfactorily shows, that the improper location of her signal lights, did not in any manner contribute to the production of the collision. This point in the case has therefore been very deliberately considered.

Notwithstanding the darkness, the haze upon the water, and the fine rain, which, together, prevented the colored lights of a vessel from being seen as far as in a dark night, with a clear atmosphere, the green light of the schooner, and the only one her heading and position required her to show to the propeller, was seen as soon as the first torch light went out, and at such distance that there was no difficulty whatever in the propeller's keeping out of the way of the schooner, by a decided change of helm, without stopping and reversing, or even stopping her engine.

It is quite certain upon the testimony that from that time forward one or the other of the schooner's colored lights were or might have been seen, except while her flash light was exhibited the second time; there is no proof that both were at any time obscured by sails, bowsprit, boom or rail; and there is no reason to believe that those in charge of the Wenona, were in any way misled by the improper location or any other defect, of such colored lights; —or that the proper colored light to indicate her heading, was not at all times visible from the Wenona. It will therefore be held that the improper location of the schooner's lights did not contribute to the collision.

The reasons why the change of wheel made by the schooner, when a collision was inevitable, and it was apparent that the propeller was taking no sufficient measures to avoid it, should not be considered a fault contributing to the collision, have already been sufficiently given.

On the whole case the propeller will be held in fault, and the schooner held to be without fault contributing to the collision.

[NOTE. On appeal to the circuit court, the above decree was reversed. Case No. 17,411. An appeal was then taken to the supreme court, where the decree of the circuit court was reversed, and the cause remanded, with directions to affirm the decree of the district court. 19 Wall. (86 U. S.) 41.]